Filed 10/29/20  I.B. v. Superior Court CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| I.B.,<br><br>        Petitioner,<br><br>v.<br><br>SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU et al.,<br><br>        Real Parties in Interest. | A160786<br><br>(Contra Costa County<br> Super. Ct. No. J19-00493) |

In this juvenile writ proceeding, I.B. (mother) seeks extraordinary relief from the juvenile court order setting a permanency planning hearing for her daughter, I.Z.B., pursuant to section 366.26 of the Welfare and Institutions Code.[1]  Mother argues that the juvenile court erred both in finding no substantial probability of I.Z.B.'s return if reunification services were

_____

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

1

extended and in concluding that reasonable services were provided. We deny the petition.

## BACKGROUND

In May 2019, the Contra Costa County Children and Family Services Bureau (Bureau) detained I.Z.B. from mother and T.E. (father)[2] shortly after her birth. The Bureau's dependency petition asserted that I.Z.B. was a child described by section 300, subdivision (b), due to pervasive domestic violence between mother and father and mother's history of mental health issues, both of which placed I.Z.B. at risk. Father had been banned from the hospital due to his domestic violence behaviors and threatening actions. Mother—who at 17 years of age was herself a dependent minor in Contra Costa County— has a lengthy history of being a commercially sexually exploited child (CSEC), beginning with sexual exploitation by her mother from the age of 10.[3] Prior to I.Z.B.'s birth, mother was refusing to enter any approved placements because she did not want to leave father, despite multiple domestic violence incidents. There were concerns that she had smoked marijuana and was being trafficked while pregnant. Although mother had been prescribed psychotropic medications for her mental health issues, she was not taking them.

Due to her age, a guardian ad litem was appointed for mother. At the jurisdictional hearing in June 2019, pursuant to a mediated agreement, mother and father pleaded no contest to an amended petition which realleged

---

[2] Father, a nonminor dependent, was raised to the status of presumed father on May 23, 2019. His reunification services were terminated at the six-month review, and he is not a party to this writ petition. Our discussion of father is thus limited to facts relevant to mother's arguments herein.

[3] As a child, mother had 58 child welfare referrals, including sustained allegations of exploitation, caretaker absence/incapacity, general neglect, and physical abuse.

the domestic violence allegations but deleted the allegation regarding mother's mental health. Mother stipulated that she would participate in a mental health assessment and follow its recommendations. The juvenile court sustained the allegations in the amended petition and declared I.Z.B. to be a person described by subdivision (b) of section 300.

In recommending reunification services for mother in advance of the dispositional hearing, the social worker noted that mother had a "history of making poor choices" despite multiple interventions by the Bureau and the probation department. The social worker opined that, in order to successfully reunify with I.Z.B., mother would not only have to "fully engage in services, but also put to practice everything she learns which in turn will improve her behavior and how she responds to difficult situations in her life." Mother stated that she was taking the child welfare case very seriously and was willing to learn and accept advice. At the July 18, 2019 dispositional hearing, I.Z.B. was declared a juvenile court dependent, formally removed from parental custody, and placed in foster care. Mother was ordered to participate in a reunification plan, including domestic violence counseling, general counseling, parenting classes, and substance abuse testing.

Mother's efforts to engage in reunification services were initially hampered by repeated incidents of domestic violence and turmoil in her life. Prior to disposition, mother had barely begun domestic violence and counseling services in San Joaquin County, where she resided with her stepfather, when she was arrested and placed in juvenile hall after a physical altercation with her brother. Mother next went to a group home in Contra Costa County, where she was given new resources to begin parenting classes, a domestic violence support group, anger management classes, counseling, and drug testing. Shortly after the July 18 dispositional hearing, father was

3

arrested after he went to the group home, threatened mother and I.Z.B., and gave mother a black eye. Mother disappeared from the group home on August 22, 2019, and the social worker received information that mother had been attacked by father at a McDonald's. Mother moved in temporarily with her sister, and the social worker assessed the home and again attempted to connect mother with services in September 2019. Mother reported that she worked with CSEC liaisons and was trying to get her diploma. On October 15, 2019, mother stated that she had a domestic violence incident with father that morning and that she had ended her relationship with him.

Mother was accepted into a transitional housing program and resided there from October 25 to December 3, when she was observed arguing with father on the phone. That same day, she reported to the police that she had been beaten by father and another man. She informed the social worker that she had been attacked by some of father's relatives. Mother was bruised on one arm, her other arm and hand were medically wrapped, and she had a neck brace. Due to this incident, mother was moved to another transitional housing program on December 6, but was observed arguing with father there that same day. Mother was terminated from the second housing program on December 9 after it learned that mother had posted an ad for prostitution services on November 21. The program expressed concern that father and his family had learned of mother's whereabouts and that mother's behaviors were putting herself and others at risk.

On December 15, mother was observed at a mall with father. The next day, she claimed to be living with a friend in Rodeo. Later she reported moving to Lodi and being kicked out of her housing for no reason. From December 20, 2019, to January 3, 2020, mother posted 32 prostitution ads from three different prostitution websites. She would not tell the social

4

worker where she was living.  Given the chaos surrounding mother, she made little progress on her case plan other than completing a parenting class.

At the six-month review on January 16, 2020, a contested hearing was set for March 5.  On that date, father's reunification services were terminated, but the parties stipulated to extend services for mother to the 12-month review.  In agreeing to extend mother's services, Bureau counsel stated: "[W]e've had a lot of discussions, and the bottom line is the department is very understanding of the fact that [mother] came in through our system as a dependent.  She has been a victim of different forms of abuse in her youth.  She is considered to be a CSEC person/victim.  [¶]  And she—things are somewhat spiraling for her out of control.  And the department wants to do everything in its power to assist her to try to get things back on track before it's too late for her."  Although the 12-month date was only three months out, the Bureau wanted to help mother reengage in services and get her some mental health assistance.

In advance of the 12-month hearing, the Bureau filed reports indicating that mother had been complying with her services.  She was meeting with a domestic violence counselor weekly by telephone, participating in weekly telephone counseling sessions, working with her CSEC counselor, and having regular video visits with I.Z.B.  Mother also completed a mental health assessment and was seeing a psychiatrist regularly for medication management.  She had been taking all prescribed medications but stopped some of them after discovering she was again pregnant.  She had obtained employment.  Although mother initially had a number of drug testing no-shows, more recently she had been consistently testing negative.  Nevertheless, the Bureau recommended that mother's reunification services be terminated.  Although mother appeared to have ceased her involvement

5

with father and was participating in her case plan, the social worker opined that mother had not made significant enough changes in her behavior and did not appear to understand the risks and safety concerns for herself and her young infant.

In February 2020, mother was caught on camera physically fighting with another woman outside of a restaurant. Mother had also engaged in sexually explicit behaviors and posted videos with an unknown male partner online. On July 20, 2020, mother described an incident on social media in which she had allowed a coworker and her boyfriend to stay with her because they were homeless. Mother expressed that the coworker took advantage of her and had toxic interactions with her boyfriend. In the post, mother threatened to "draw blood" and stated that her boyfriend had a gun. After mother kicked them out of her apartment, the coworker started an altercation with mother at work, pushing mother. On July 22, mother reported being groped and harassed by an older man whom she did not know at a Chinese restaurant. Although mother stated she was again pregnant, she refused to sign any releases so that the Bureau could speak to her doctor.

A contested 12-month review hearing was held on August 6, 2020. Testimony by mother revealed that, earlier that day, another domestic violence incident had occurred after mother's roommate posted online that mother was dead. Mother's family members became upset and came to the residence. A fight ensued between mother's family and the roommate's family. Mother admitted that she had falsely reported that the police broke down her door because she was trying to protect her roommate. Mother also testified that she had a relatively new boyfriend, but she was taking some space from him to work on her mental health and her case plan. Her previous boyfriend had been set up and killed by others on May 7, 2020. The

6

social worker testified that she did not believe mother had sufficient insight to protect her daughter and she was "not certain that [mother] can prevent future domestic violence incidents." She remained concerned that mother continued to report inaccurate information both to herself and to other professionals.

The juvenile court specifically credited the testimony of the social worker and found mother's testimony not credible. Although the court commended mother for her recent participation in services, it found that there was "a great deal of instability and chaos in her life." The court expressed particular concern about mother's continued risky and unwise behaviors. It concluded that "although she's taken the classes and has been able to articulate a safety plan, she is not, in fact, able to keep herself safe and, by extension, her daughter safe if her daughter were with her." The juvenile court thus found that mother had not made substantial progress with her case plan because "her behavior does not suggest that she has fully internalized and can apply the lessons from the domestic violence classes." The court further found by clear and convincing evidence that there was no substantial probability that I.Z.B. could be returned to mother if services were extended to 18 months. The court therefore terminated mother's reunification services and set the matter for a permanency planning hearing pursuant to section 366.26 so that a permanent out-of-home plan could be established for I.Z.B. This timely petition followed.

## DISCUSSION

In this petition, mother contests the termination of her reunification services. Specifically, she challenges the juvenile court's finding that there was no substantial probability I.Z.B. could be returned to her care by the 18-month review date. She also argues that reasonable reunification services

7

were not provided to her.  We review both of these determinations for substantial evidence.  (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018; *In re Shaundra L.* (1995) 33 Cal.App.4th 303, 316.)

Substantial evidence is "reasonable, credible evidence of solid value such that a reasonable trier of fact could make the findings challenged." (*In re Brian M.* (2000) 82 Cal.App.4th 1398, 1401.)  "The issue of sufficiency of the evidence in dependency cases is governed by the same rules that apply to all appeals.  If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we uphold those findings.  [Citation.]  We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or evaluate the weight of the evidence.  Rather, we draw all reasonable inferences in support of the findings, view the record most favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary conclusion." (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251 (*Megan S.*); see *Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.)

Where a finding below is made by clear and convincing evidence, we bear in mind that standard when conducting our substantial evidence review. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005 ["[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the [appellate] court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof."]; see *T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229,1239 [" '[w]e review the record in the light most favorable to the trial court's order to determine whether there is substantial evidence from which a reasonable trier of fact could make the necessary

findings *based on the clear and convincing evidence standard'* "].) Mother bears the burden of establishing that the juvenile court's findings were not adequately supported. (*Megan S.*, *supra*, 104 Cal.App.4th at p. 251.) We conclude that she cannot meet this burden on the record before us.

## A.   *Extension of Services to 18 Months*

When a dependent child is removed from parental custody, "the juvenile court ordinarily must order child welfare services for the minor and the parent for the purpose of facilitating reunification of the family. (§ 361.5, subd. (a).) For a child under three years of age at the time of removal, as [I.Z.B.] was, reunification services are presumptively limited to six months." (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843 (*Tonya M.*).) This is because the " ' "unique developmental needs of infants and toddlers" ' [citation] justif[y] a greater emphasis on establishing permanency and stability earlier in the dependency process." (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 175 (*M.V.*).)

Thus, as our high court has explained, for the parent of a child under three at the time of removal, the statutory scheme of providing reunification services establishes "three distinct periods and three corresponding distinct escalating standards." (*Tonya M.*, *supra*, 42 Cal.4th at p. 845.) In the first period—a phase from the jurisdictional hearing to the six-month review hearing where services are "presumed"—"services are afforded essentially as a matter of right." (*Ibid.*) In the second period—a phase from the six-month review hearing to the 12-month review hearing where services are "possible"—"a heightened showing is required to continue services." (*Ibid.*; see § 366.21, subd. (e)(3) [requiring the court to continue the case to the 12-month hearing where "there is a substantial probability that the child . . . *may* be returned to his or her parent . . . within six months" (italics added)].)

9

And in the third period—a phase from the 12-month review hearing to the 18-month review hearing where services are "disfavored" (*Tonya M.*, at p. 845.)— services can be continued only if there is a "substantial probability that the child *will* be returned" within the extended time period (§ 366.21, subd. (g)(1) (italics added)), and "the juvenile court finds specifically that the parent has 'consistently and regularly contacted and visited with the child,' made 'significant progress' on the problems that led to removal, and 'demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs.' " (*Tonya M.*, at p. 845, quoting § 366.21, subd. (g)(1)(A)-(C); see *M.V.*, *supra*, 167 Cal.App.4th at p. 178 ["the court can only continue the case to the 18-month review if it finds a substantial probability the child will be returned to the parent; moreover, the court must find all three of the listed factors to justify a finding of a substantial probability the child will be returned to his or her parent"].)

In the present case, mother argues that she consistently and regularly had positive visits with I.Z.B. Mother further claims that she was largely compliant with her case plan and thus had done enough to warrant the continuation of services to the 18-month review. She faults the juvenile court for failing to consider her youth and extensive history of abuse when refusing to extend her reunification period. And she asserts the juvenile court's conclusion that she could not reunify with I.Z.B. by the 18-month date was pure speculation.

As an initial matter, we note that an 18-month review hearing must "occur within 18 months of the date the child was originally taken from the physical custody of his or her parent." (§ 366.21, subd. (g)(1).) In the present case I.Z.B. was removed from mother's physical custody on May 16, 2019.

10

Thus, the juvenile court was required to consider whether there was a substantial probability of return in light of the time remaining, a period of slightly over three months. (See *Tonya M.*, *supra*, 42 Cal.4th at p. 846 ["if at most four months remain until the next review hearing (i.e., the 12-month hearing or 18-month hearing), at most only four months of services can by law be ordered, and the juvenile court therefore should consider only what the impact of *those* four months of services would be on the parent and child"].)

There is no dispute that mother maintained consistent, regular, and positive contact with I.Z.B. and that she actively engaged in her reunification plan. Indeed, the juvenile court commended mother for her participation in services and the progress she had made. We too applaud mother's efforts, especially in light of her traumatic history, and hope that she will continue to take advantage of available services and work toward stabilizing her life circumstances.

However, substantial evidence supports the juvenile court's finding that I.Z.B. was unlikely to be returned to mother within the approximately three months remaining before the expiration of the 18-month review period. Despite the many services provided to her, mother continued to involve herself in violent and dangerous interactions with others, such as the dispute with her coworker, her physical altercation with another woman at a fast food restaurant, and the brawl between two families which resulted from her roommate's fake report of mother's death. The social worker expressed concern about mother harming others, risking her safety, and reporting inaccurate information. She opined that mother had not gained sufficient insight to protect I.Z.B., and she was "not certain" mother could "prevent future domestic violence interactions." The juvenile court agreed, noting that

11

mother gets into "an extraordinary number of arguments and altercations and engages in dangerous behavior that does pose risk to her and would pose risk to [I.Z.B.] if [I.Z.B.] were in her custody." The juvenile court expressly found the social worker credible and mother not credible.

Contrary to mother's contention, the court was clearly aware of mother's youth, her history of abuse, and her CSEC status. Indeed, the parties stipulated to continue services from the 6-month review to the 12-month review largely to give mother more time given her difficult personal history. The court nevertheless concluded, based on mother's ongoing risky and dangerous behaviors, that mother had not made substantial progress with her case plan as of the 12-month date because she had failed to sufficiently internalize what she had learned in her domestic violence classes. This finding is amply supported by the record. (See § 366.21, subd. (g)(1)(B) [disallowing extension of services to the 18-month mark where a parent fails to make "significant progress in resolving problems that led to the child's removal from the home"].) The court additionally found, by clear and convincing evidence, no substantial probability that I.Z.B. would be returned to mother if services were extended. (See *id.*, subd. (g)(1).) We decline to reweigh the evidence in this difficult case. (See *In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53 [the juvenile court alone determines where the weight of the evidence lies].)

## II.   *Reasonable Services*

Pursuant to section 366.21, subdivision (g)(1), the juvenile court must continue reunification services past the 12-month hearing if it finds that reasonable services have not been provided to a parent. Reunification services, which play a critical role in dependency proceedings, must be tailored to the particular needs of the family. (§ 361.5; *In re Alanna A.* (2005)

12

135 Cal.App.4th 555, 563; *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 793.) We evaluate the reasonableness of the Bureau's reunification efforts according to the circumstances of each case. (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.) To support a finding that reasonable services were offered or provided, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) Mother asserts here that the juvenile court erred in finding that reasonable reunification services were provided to her, essentially arguing that the Bureau failed to sufficiently prioritize her mental health services. We disagree.

We first address the Bureau's contention that mother has forfeited this claim by failing to raise it below. It is true that, as a general rule, an appellate court will not consider a challenge to a ruling that could have been but was not raised in the trial court. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962.) This forfeiture doctrine has been applied in dependency proceedings in a wide variety of contexts. (See *In re Dakota S.* (2000) 85 Cal.App.4th 494, 502 [collecting cases].) However, at the 12-month review hearing, the Bureau bears the burden of establishing by clear and convincing evidence that it provided the parent reasonable reunification

services, and the juvenile court must find that the Bureau satisfied this burden before it can terminate services. (*In re K.C.* (2012) 212 Cal.App.4th 323, 329.) A parent's insufficiency-of-the-evidence challenge to a mandatory finding such as this is not forfeited by failure to object below. (See *In re Javier G.* (2006) 137 Cal.App.4th 453, 464 ["Even if the parent does not contest the state of the evidence, he or she preserves the right to challenge it as insufficient to support a particular legal conclusion."].) Stated another way, when the merits of a case are contested, a parent is not required to object to the agency's failure to carry its burden of proof. (*In re Brian P.* (2002) 99 Cal.App.4th 616, 622–623.) As a general matter, mother has not forfeited her claim that the Bureau provided insufficient services to address her mental health needs.

In arguing that her services were inadequate, however, mother asserts that while she agreed to participate in a mental health assessment at the June 2019 jurisdictional hearing, the Bureau did not facilitate that assessment until the six-month review in March 2020. She argues that she might have made more progress had she started working on her mental health earlier. To the extent mother is challenging the Bureau's failure to include a mental health assessment in her initial case plan, mother has forfeited *that* argument by failing to challenge the content of the reunification plan by direct appeal from the dispositional order. (See *In re Julie M.* (1999) 69 Cal.App.4th 41, 47.) Moreover, when the parties stipulated to continuing mother's reunification services at the six-month review, the juvenile court found by clear and convincing evidence that reasonable reunification services had been provided by the Bureau to mother, and mother did not appeal from the six-month order. Thus, mother cannot complain about the adequacy of

14

her services during this first six-month period. (See *Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 812.)

With respect to the provision of services for the remaining period, substantial evidence supports the juvenile court's finding that reasonable services were offered or provided to mother in this case. Indeed, mother has received an abundance of services, not only in these proceedings but also in her own dependency action and from her CSEC resources. While it is unclear on this record why the Bureau did not include a mental health assessment in its original reunification plan, counseling was included. It also appears that mother had previously received some mental health services as she had been prescribed psychotropic medications that she was failing to take at the time this petition was filed. Mother's inability to make progress on her reunification plan at the beginning of this case had less to do with the adequacy of the services provided and more to do with her continued behaviors that placed her in dangerous and risky situations, including repeated incidents of domestic violence. While it is true that mother participated in the many services provided to her after the six-month review, she was unfortunately not able to internalize and apply those lessons in a sustained way within the statutory timeframes established to provide permanence for her young daughter.

### DISPOSITION

The petition is denied on the merits. (See § 366.26, subds. (*l*)(1)(C), (*l*)4(B).) Because the permanency planning hearing in this matter is set for December 3, 2020, this opinion is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).) Mother's request for a stay of the permanency planning hearing is denied as moot.

15

_____
Sanchez, J.

WE CONCUR:


_____
Humes, P. J.


_____
Margulies, J.

_A160786  I.B. v. Superior Court_

16